Steven J. Lechner, D.C. Bar No. AZ 0001
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)
lechner@mountainstateslegal.com

Attorney for American Exploration & Mining Association

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **AMERICAN EXPLORATION &** | ) | |
| **MINING ASSOCIATION**, a Washington | ) | |
| Non-profit Corporation, 10 N Post Street, | ) | |
| Suite 305, Spokane, WA 99201-0705; | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| **U.S. ENVIRONMENTAL** | ) | |
| **PROTECTION AGENCY**, | ) | |
| William Jefferson Clinton Building, | ) | |
| 1200 Pennsylvania Avenue, NW, | ) | |
| Washington, DC 20460; | ) | |
| **REGINA MCCARTHY**, sued in her | ) | |
| official capacity, Administrator, U.S. | ) | |
| Environmental Protection Agency, | ) | |
| William Jefferson Clinton Building, | ) | |
| 1200 Pennsylvania Avenue, NW, | ) | |
| Mail Code: 1101A, Washington, DC 20460; | ) | |
| **U.S. ARMY CORPS OF ENGINEERS**, | ) | |
| 441 G Street, NW, Washington, DC | ) | |
| 20314-1000; | ) | |
| **JO-ELLEN DARCY**, sued in her official | ) | |
| capacity, Assistant Secretary of the Army | ) | |
| (Civil Works), 108 Army Pentagon, | ) | |
| Washington, DC 20310-0108; | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff, American Exploration & Mining Association ("AEMA"), a non-profit corporation incorporated under the laws of the State of Washington, brings this action for declaratory and injunctive relief against Defendants, U.S. Environmental Protection Agency ("EPA"), U.S. Army Corps of Engineers ("Corps"), and the above captioned officers (referred to individually and collectively as "Defendants"), for their unlawful actions in issuing the Final Rule defining "waters of the United States" under the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.* 80 Fed. Reg. 37,054 (June 29, 2015). Specifically, Defendants violated both the Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 601 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*

AEMA brings this action out of an abundance of caution. *See Inv. Co. Inst. v. Bd. of Governors of Fed. Reserve Sys.*, 551 F.2d 1270, 1280 (D.C. Cir. 1977) ("If any doubt as to the proper forum exists,… counsel should file suit in both the court of appeals and the district court …."). On November 9, 2015, AEMA timely filed a Petition for Review of the Final Rule in the U.S. Court of Appeals for the District of Columbia, before the 120-day statute of limitations in Section 509(b)(1) of the CWA, 33 U.S.C. § 1369(b)(1), expired. AEMA's Petition for Review was subsequently transferred to the U.S. Court of Appeals for the Sixth Circuit and consolidated with 21 other Petitions for Review of the Final Rule. *See In re: Am. Exploration & Mining Ass'n v. EPA*, No. 15-4305 (6th Cir.). At the time of transfer, there were a number of motions to dismiss for lack of subject-matter jurisdiction filed by other petitioners pending before the Sixth Circuit.

On February 22, 2016, in a decision fractured into three separate opinions, a panel of the Sixth Circuit concluded that it has subject-matter jurisdiction over the Petitions for Review. *In re: U.S. Dep't of Defense & EPA Final Rule: Clean Water Rule: Definition of "Waters of the*

*United States,"* 817 F.3d 261, 274 (6th Cir. 2016) ("*In re WOTUS RULE*").  Importantly, Judge

Griffin, who cast the deciding vote for jurisdiction, only did so because he felt compelled by

binding Sixth Circuit precedent—not because the text of the statute conferred jurisdiction on the

courts of appeals.  *Id*. at 275–83 (Griffin, J., concurring).  On April 21, 2016, the Sixth Circuit

denied several petitions for rehearing en banc.

That there is substantial uncertainty whether the courts of appeals have jurisdiction over

the Final Rule is an understatement.  *Compare In re WOTUS RULE*, 817 F.3d at 263–74

(McKeague, J.) (lead opinion) *with id*. at 283–84 (Keith, J., dissenting), *and North Dakota v.*

*EPA*, 127 F. Supp. 3d 1047, 1052 (D.N.D. 2015) (district court concluding that it has original

jurisdiction to consider challenges to the Final Rule).  In light of this uncertainty and because it

may ultimately be determined that the Sixth Circuit lacks jurisdiction over the Final Rule,

AEMA files this Complaint for Declaratory and Injunctive Relief, as a protective measure in

light of the one-year statute of limitations in the RFA, 5 U.S.C. § 611(a)(3)(A), and alleges as

follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject-matter of this case, pursuant to 28

U.S.C. § 1331, because the matter in controversy arises under the laws of the United States,

including, but not limited to, the RFA and the APA.

2.      Venue rests properly in this Court, pursuant to 28 U.S.C. § 1391, because, *inter*

*alia*, Defendant Regina McCarthy, Administrator of the EPA, resides and/or performs a

significant amount of her official duties in this judicial district.

**PARTIES**

3.     Plaintiff AEMA (f/k/a Northwest Mining Association) is a non-profit, non-partisan, membership association incorporated under the laws of the State of Washington, with its principal place of business in Spokane, Washington.

4.     AEMA is the recognized national voice in support of exploration, the junior mining sector, and maintaining access to federal lands.

5.     AEMA's purpose is to advocate for and advance the mineral resource and mining related interests of its members.  AEMA accomplishes its purpose by representing and informing members on legislative, regulatory, safety, technical, and environmental issues.  AEMA is committed to principles that embody the protection of human health, the natural environment, and a prosperous economy.

6.     AEMA has represented the hardrock mining industry for 121 years and, currently, has over 2,300 members residing in 42 states.  AEMA also has members in seven other countries.

7.     AEMA's membership is broad-based, including small miners, exploration geologists, small and large mining companies, engineers, equipment manufacturers, technical service workers, and salespersons of equipment and supplies.  Of its broad-based membership, more than 80% of AEMA's members are small entities or work for small entities.  Many of these members have small mining business concerns that employ less than or equal to 500 employees.

8.     AEMA's members engage in activities on land and in or near water that often require jurisdictional determinations, under the CWA, before proceeding.  The Final Rule's definition of "waters of the United States" greatly expands CWA jurisdiction.  The expanded reach of the CWA will result in increased costs and delay for AEMA's members.

9.      The Final Rule will have a substantial effect on AEMA's small mining business members' ability to finance and develop new projects or perform maintenance on existing infrastructure and facilities.

10.     Defendants' Final Rule defining "waters of the United States," under the CWA, will directly and adversely affect AEMA's members, especially its small entity members and members with small mining business concerns.

11.     Defendant EPA is an agency of the United States government that is responsible for administering certain environmental statutes, such as the CWA.  For example, the EPA administers pollution control programs involving navigable waters under the CWA.

12.     Defendant Regina McCarthy is the Administrator of the EPA.  Defendant McCarthy signed the Final Rule on May 27, 2015, which was published in the *Federal Register* on June 29, 2015.  Defendant McCarthy is sued in her official capacity.

13.     Defendant Corps is an agency of the United States government that is responsible for administering certain provisions of the CWA, such as Section 404, 33 U.S.C. § 1344.

14.     Defendant Jo-Ellen Darcy is Assistant Secretary of the Army (Civil Works) for the Department of the Army.  Defendant Darcy also signed the Final Rule.  Defendant Darcy is sued in her official capacity.

## LEGAL BACKGROUND

**A.      The Clean Water Act.**

15.     The CWA provides, *inter alia*:  "[t]he objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).

16.     The CWA also provides that "[i]t is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources ...."  33 U.S.C. § 1251(b).

17.     The CWA statutorily defines "navigable waters" as "the waters of the United States, including the territorial seas."  33 U.S.C. § 1362(7).  This term determines the scope of Defendants' jurisdiction under the CWA.  *See United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 126 (1985).

18.     The term "navigable waters" is used in a number of CWA provisions that regulate activities, including:  (a) Section 303, regarding water quality standards and total maximum daily load programs; (b) Section 311, regarding the oil spill prevention and response program; (c) Section 401, regarding state water quality certification; (d) Section 402, regarding point source discharge permits under the National Pollutant Discharge Elimination System; and (e) Section 404, regarding the discharge of dredged or fill material.  *See* 33 U.S.C. §§ 1313 (Section 303), 1321 (Section 311), 1341 (Section 401), 1342 (Section 402), 1344 (Section 404).

19.     The CWA also imposes criminal and civil liability on persons who violate its provisions.  *See* 33 U.S.C. § 1319(b) (authorizing the Administrator to commence civil actions against persons for noncompliance); *id*. § 1319(c)(1) (mandating negligent violations to be punished by a fine between $2,500 and $25,000 per day, or imprisonment for up to a year, or both, with increases for subsequent convictions); *id*. § 1319(c)(2) (mandating knowing violations to be punished by a fine between $5,000 and $50,000 per day, or imprisonment for up to 3 years, or both, with increases for subsequent convictions).

20.     In 1986, Defendants promulgated regulations defining "waters of the United States."  Portions of these regulations were challenged.

21.     For example, in *Riverside Bayview*, the Supreme Court considered the Corps' jurisdiction over wetlands adjacent to navigable waters.  474 U.S. at 139.  Ultimately, the Court upheld the Corps' interpretation of "waters of the United States" to include wetlands that "actually abut[] on" traditional navigable waters.  *Id*. at 135.

22.     Later, in *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159, 162 (2001) ("*SWANCC*"), the Supreme Court declined to extend the Corps' jurisdiction to an abandoned sand and gravel pit used by migratory birds.  *Id*.  The Court held that *Riverside Bayview* did not establish "that the jurisdiction of the Corps extends to ponds that are not adjacent to open water."  *Id*. at 167–68.  The Court concluded that "nonnavigable, isolated, intrastate waters" could not give rise to CWA jurisdiction.  *Id*. at 171–72, 174.

23.     More recently, in *Rapanos v. United States*, 547 U.S. 715, 730 (2006) (plurality opinion), the Supreme Court addressed the scope of the Corps' statutory authority under the CWA over intrastate wetlands adjacent to non-navigable tributaries of navigable waters.  *Id*. This decision resulted in two different tests.

24.     Justice Scalia, writing for the plurality in *Rapanos*, concluded that "'waters of the United States' includes only those relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams[,] ... oceans, rivers, [and] lakes.'"  547 U.S. at 739 (quoting Webster's New International Dictionary 2882 (2d ed. 1954) (omission and substitutions in original)).

25.     Justice Kennedy, concurring in the *Rapanos* judgment, but rejecting the plurality's reasoning, opined that the Corps' jurisdiction extends to wetlands that "possess a

'significant nexus' to waters that are or were navigable in fact or that could reasonably be so made." 547 U.S. at 759 (Kennedy, J., concurring).

26.     In response to the Supreme Court's decision in *Rapanos*, Defendants issued final guidance regarding the definition of "waters of the United States." *See* Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos v. United States & Carabell v. United States* (Dec. 2, 2008) ("2008 Guidance"), *available at* https://www.epa.gov/sites/production/files/2016-02/documents/cwa_jurisdiction_following_rapanos120208.pdf.  Although the 2008 Guidance was not subject to notice and comment rulemaking, between 2009 and issuance of the Final Rule, Defendants purportedly used the 2008 Guidance in making jurisdictional determinations.

**B.     The Regulatory Flexibility Act.**

27.     The RFA was enacted with the purpose of requiring agencies "to fit regulatory and informational requirements to the scale of businesses, organizations, and governmental jurisdictions subject to regulation."  Pub. L. No. 96-354, § 2(b), 94 Stat. 1164 (1980).  In order to achieve this purpose, "agencies are required to solicit and consider flexible regulatory proposals and to explain the rationale for their actions to assure that such proposals are given serious consideration." *Id*.

28.     In 1996, Congress amended the RFA to address the enforcement of its mandates. Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, §§ 201–253, 110 Stat. 847, 857–74 (1996).  Congress found that agencies were ignoring the RFA's requirements, thereby causing small entities to bear "greater regulatory burdens than necessitated by statute."  Pub. L. No. 104-121, § 202(5).  One of the purposes for this amendment was "to make [agencies] more accountable for their enforcement actions by providing small entities with

a meaningful opportunity for redress of excessive enforcement activities." *Id*. § 203(7).  For

those reasons, Congress amended the RFA to provide for judicial review of an agency's

compliance or noncompliance with the RFA under the judicial review provisions of the APA.

*See* 5 U.S.C. § 611.

29.     The RFA provides that "[w]henever an agency is required by [5 U.S.C. § 553], or

any other law, to publish general notice of proposed rulemaking for any proposed rule,... the

agency *shall* prepare and make available for public comment an initial regulatory flexibility

analysis." 5 U.S.C. § 603(a) (emphasis added).  An initial regulatory flexibility analysis must

contain:

> (1)     a description of the reasons why action by the agency is being
>         considered;
>
> (2)     a succinct statement of the objectives of, and legal basis for, the
>         proposed rule;
>
> (3)     a description of and, where feasible, an estimate of the number of
>         small entities to which the proposed rule will apply;
>
> (4)     a description of the projected reporting, recordkeeping and other
>         compliance requirements of the proposed rule, including an
>         estimate of the classes of small entities which will be subject to the
>         requirement and the type of professional skills necessary for
>         preparation of the report or record; [and]
>
> (5)     an identification, to the extent practicable, of all relevant Federal
>         rules which may duplicate, overlap or conflict with the proposed
>         rule.

*Id*. § 603(b).

30.     An initial regulatory flexibility analysis must also "contain a description of any

significant alternatives to the proposed rule which accomplish the stated objectives of applicable

statutes and which minimize any significant economic impact of the proposed rule on small

entities." 5 U.S.C. § 603(c).

31.     Prior to publication of the initial regulatory flexibility analysis, the RFA requires an agency to convene a small business advocacy review panel ("SBAR panel"), which includes "Federal employees of the office within the agency responsible for carrying out the proposed rule, the Office of Information and Regulatory Affairs within the Office of Management and Budget, and the Chief Counsel [for the Office of Advocacy of the Small Business Administration.]" 5 U.S.C. § 609(b)(3).  The SBAR panel must review materials prepared by the agency proposing the rule, as well as "collect advice and recommendations" from small entity representatives identified by the Chief Counsel.  *Id*. § 609(b)(4).  After such review, the SBAR panel must report on the comments from the small entity representatives and its findings regarding the initial regulatory flexibility analysis.  *Id*. § 609(b)(5).  This report is made public and made part of the rulemaking record.  *Id*.

32.     The RFA also provides:  "[w]hen an agency promulgates a final rule under [5 U.S.C. § 553], after being required by that section or any other law to publish a general notice of proposed rulemaking …, the agency *shall* prepare a final regulatory flexibility analysis."  5 U.S.C. § 604(a) (emphasis added).  A final regulatory flexibility analysis must contain, *inter alia*:

(1)     a statement of need for, and objectives of, the rule;

(2)     a statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments;

(3)     the response of the agency to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule as a result of the comments;

(4)     a description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available;

(5)     a description of the projected reporting, recordkeeping and other compliance requirements of the rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record; [and]

(6)     a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected[.]

*Id.* (footnote omitted).

33.     An agency does not have to complete an initial or a final regulatory flexibility analysis only "if the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b). However, an agency may still convene a SBAR panel if "the agency believes [the rule] may have a greater than de minimis impact on a substantial number of small entities." *Id.* § 609(c).

34.     The RFA provides that "a small entity that is adversely affected or aggrieved by final agency action is entitled to judicial review of agency compliance with the requirements of [5 U.S.C. §§ 601, 604, 605(b), 608(b), 610]" in accordance with the judicial review provisions of the APA, 5 U.S.C. §§ 701–706.  5 U.S.C. § 611(a)(1).  Additionally, "[a]gency compliance with [5 U.S.C. §§ 607, 609(a)] shall be judicially reviewable in connection with judicial review of [5 U.S.C. § 604]." *Id.*

35.     The RFA also provides that courts "shall have jurisdiction to review any claims of noncompliance with [5 U.S.C. §§ 601, 604, 605(b), 608(b), 610]" in accordance with the judicial

review provisions of the APA, 5 U.S.C. §§ 701–706.  5 U.S.C. § 611(a)(2).  An agency's

compliance with 5 U.S.C. §§ 607, 609(a) is also judicially reviewable in connection with a

court's review of an agency's compliance with 5 U.S.C. § 604.  *Id.*

36.     Under the RFA, if a court grants relief, "the court shall order the agency to take

corrective action consistent with [Chapters 6 and 7 of Title 5 of the U.S. Code], including but not

limited to[:]  (A) remanding the rule to the agency, and (B) deferring the enforcement of the rule

against small entities unless the court finds that continued enforcement of the rule is in the public

interest."  5 U.S.C. § 611(a)(4); *see Northwest Mining Ass'n v. Babbitt*, 5 F. Supp. 2d 9, 16

(D.D.C. 1998) (remanding a final rule because the agency violated the RFA).  The court may

also stay the effective date of any rule.  5 U.S.C. § 611(a)(5).

## C.     The Administrative Procedure Act.

37.     The APA requires agencies to publish notice of proposed rulemaking in the

*Federal Register* and provide the public with adequate notice and opportunity to participate in

the rulemaking by submitting comments.  5 U.S.C. § 553.  Accordingly, if a final rule differs

from the rule proposed by an agency to the extent it is not a "logical outgrowth" of the proposed

rule, then the agency must solicit further comments on the changes.  *See Allina Health Servs. v.*

*Sebelius*, 746 F.3d 1102, 1107–08 (D.C. Cir. 2014); *Shell Oil Co. v. EPA*, 950 F.2d 741, 750–51

(D.C. Cir. 1991).

38.     The APA provides that "[a]gency action made reviewable by statute and final

agency action for which there is no other adequate remedy in a court are subject to judicial

review."  5 U.S.C. § 704.

39.     The APA also provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.

40.     The APA mandates that "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action" and "hold unlawful and set aside agency action, findings, and conclusions" found to be, *inter alia*:

> (A)     arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B)     contrary to constitutional right, power, privilege, or immunity;
>
> (C)     in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [and/or]
>
> (D)     without observance of procedure required by law[.]

5 U.S.C. § 706(2).

## FACTUAL BACKGROUND

**A.     The Proposed Rule.**

41.     On May 2, 2011, three years after the release of the 2008 Guidance, Defendants published draft guidance ("2011 Draft Guidance") in the *Federal Register* and solicited public comments.  76 Fed. Reg. 24,479 (May 2, 2011).

42.     The 2011 Draft Guidance purported to significantly expand the jurisdictional reach of the CWA.  76 Fed. Reg. at 24,479 ("The agencies believe that under this proposed guidance the number of waters identified as protected by the [CWA] will increase compared to current practice ….").  Defendants never issued final guidance defining "waters of the United States."

43.     Instead, on April 21, 2014, Defendants published a proposed rule defining "waters of the United States" ("Proposed Rule"), which purported to delineate the scope of jurisdiction under the CWA.  79 Fed. Reg. 22,188 (Apr. 21, 2014).  Defendants set an initial deadline for the submission of public comments on July 21, 2014.  *Id*.

44.     The Proposed Rule sought to define certain categories of waters as "waters of the United States" by rule, including, but not limited to "tributaries," and "adjacent waters."  79 Fed. Reg. at 22,188–89.  Additionally, the Proposed Rule defined certain "other waters" as jurisdictional if, after a case-specific analysis, these waters "either alone or in combination with similarly situated 'other waters' in the region,... have a 'significant nexus' to a traditional navigable water, interstate water, or the territorial seas."  *Id*. at 22,189.  The Proposed Rule defined "region" as "the watershed that drains to the nearest [traditional navigable water, interstate water, or territorial sea] ...."  *Id*. at 22,212.

45.     The Proposed Rule defined "tributary" as "a water physically characterized by the presence of a bed and banks and ordinary high water mark ... which contributes flow, either directly or through another water, to [water used or susceptible to use in interstate or foreign commerce, interstate waters, territorial seas, or impoundments of these waters or tributaries of these waters]."  79 Fed. Reg. at 22,263.  However, Defendants did not define "bed and banks."

46.     The Proposed Rule also defined "adjacent waters" as "bordering, contiguous, or neighboring."  79 Fed. Reg. at 22,207.  Defendants then proposed, for the first time, to define "neighboring" as meaning "waters located within the riparian area or floodplain of" traditional navigable waters, interstate waters, territorial seas, impoundments, or tributaries, "or waters with a shallow subsurface hydrologic connection or confined surface hydrologic connection to such a jurisdictional water."  *Id*. at 22,207, 22,263.  The terms "riparian area" and "floodplain" were

also defined in the Proposed Rule.  *Id*.  "Floodplain" was defined as "an area bordering inland or coastal waters that was formed by sediment deposition from such water under present climatic conditions and is inundated during periods of moderate to high water flows."  *Id*.  The Proposed Rule did not contain a description of "floodplain" that referred to intervals or specific boundaries, but indicated flood intervals would be in the Defendants' discretion.  *Id*. at 22,209.

47.     Along with the Proposed Rule, Defendants provided what they called an "Economic Analysis of Proposed Revised Definition of Waters of the United States" (Apr. 21, 2014) ("Draft Economic Analysis").

48.     In the Draft Economic Analysis, Defendants admitted that the "cost and benefit estimates [were] incomplete" and suffered from "data and methodological limitations, as well as ... inherent assumptions."  Draft Economic Analysis at 2.  Moreover, the data used to inform the cost analysis in the Draft Economic Analysis was based on 2009–2010 field data, *i.e.*, data that was 4–5 years old.  *Id*. at 2, 11–12.

49.     The Draft Economic Analysis compared the Proposed Rule to two baselines:  (a) historic practices based on Defendants' "existing (1986) regulations" defining "waters of the United States;" and (b) recent practices based on 2009–2010 field data utilizing the 2008 Guidance.  Draft Economic Analysis at 2 & n.1, 11.

50.     The historic practices baseline is grounded on Defendants' "existing (1986) regulation" defining "waters of the United States" that was challenged in *Riverside Bayview*, *SWANCC*, and *Rapanos*.  Draft Economic Analysis at 2 & n.1.  Based on the historic practices baseline, Defendants theorized there would be a decrease in the scope of CWA jurisdiction under the Proposed Rule, because the historical practices baseline did not reflect the Supreme Court's decisions in *Riverside Bayview*, *SWANCC*, and *Rapanos*.  *Id*. at 2.

51.     In contrast, the recent practices baseline is grounded on the 2008 Guidance, which purportedly addresses the Supreme Court's plurality opinion in *Rapanos*.  *See* Draft Economic Analysis at 2; 2008 Guidance at 1.  Based on the recent practices baseline, Defendants expected the Proposed Rule to cause "an approximate 3 percent increase in assertion of jurisdiction when compared to 2009–2010 field practices ...."  Draft Economic Analysis at 2, 12.

52.     Based on the Draft Economic Analysis, Defendants concluded that the final rule would result in increased costs to regulated entities in the form of "permit application expenses, compensatory mitigation, and installation of best management practices."  Draft Economic Analysis at 32.  Additionally, "[m]ost of the projected costs would likely accrue to landowners and development companies, state and local governments investing in infrastructure, *and industries involved in resource extraction*."  *Id.* (emphasis added).

53.     Defendants had two baselines to choose from to determine whether the Proposed Rule would have a significant economic impact on a substantial number of small entities.  Defendants admit that the recent practices baseline was appropriate and the most useful for comparing the impact of the Proposed Rule on regulated entities.  Draft Economic Analysis at 2 n.1.  This recent practices baseline provided estimates on the increased costs that regulated entities could expect under the Proposed Rule—despite the outdated 2009–2010 field data.  But for unknown reasons, Defendants ignored this recent practices baseline when making the certification in the Proposed Rule under the RFA.  79 Fed. Reg. at 22,220.  Instead, Defendants relied on the historic practices baseline to make the certification.  *Id.*

54.     Based upon the historic practices baseline, Defendants "certified that this proposed rule will not have a significant economic impact on a substantial number of small

entities." 79 Fed. Reg. at 22,220.  This certification did not contain the factual basis as required

by the RFA, but rather stated that:

> The scope of regulatory jurisdiction in this proposed rule is narrower than that
> under the existing regulations....  Because fewer waters will be subject to the
> CWA under the proposed rule than are subject to regulation under the existing
> regulations, this action will not affect small entities to a greater degree than the
> existing regulations.  As a consequence, this action if promulgated will not have a
> significant adverse economic impact on a substantial number of small entities, and
> therefore no regulatory flexibility analysis is required.

*Id*.  Defendants did not explain why the recent practices baseline was not used.  Defendants'

certification in the Proposed Rule allowed them to circumvent their obligation to complete an

initial regulatory flexibility analysis under the RFA.  *See* 5 U.S.C. §§ 603, 605(b).

55.     Defendants' certification in the Proposed Rule also allowed them to avoid their

obligation to convene a SBAR panel.  5 U.S.C. § 609(b).  Although the Draft Economic Analysis

demonstrated that the rule may have a greater than de minimis impact, albeit on all entities,

Defendants chose not to convene a SBAR panel—which would have, *inter alia*, collected

information and recommendations from small entities.  *See id*. §§ 609(b), (c).

56.     On June 24, 2014, Defendants extended the comment period for the Proposed

Rule to October 20, 2014.  79 Fed. Reg. 35,712 (June 24, 2014).

57.     On October 14, 2014, the Defendants extended the comment period for the

Proposed Rule to November 14, 2014.  79 Fed. Reg. 61,590 (Oct. 14, 2014).

58.     In October 2014, the Office of Advocacy of the Small Business Administration

submitted comments on the Proposed Rule.  Comments from the Office of Advocacy of the

Small Business Administration, to Regina McCarthy, EPA, and Maj. Gen. John Peabody, Corps

(Oct. 1, 2014) ("Office of Advocacy Comments").  The Office of Advocacy primarily

"measure[s] the direct costs and other effects of government regulation on small businesses; and

make[s] legislative and nonlegislative proposals for eliminating excessive or unnecessary regulations of small businesses." 15 U.S.C. § 634b(3). Further, the Chief Counsel for the Office of Advocacy is mandated by the RFA to "monitor agency compliance with [the RFA] …." 5 U.S.C. § 612(a); *see id*. § 612(b) (authorizing the Chief Counsel to appear as amicus curiae in actions and "present his or her views with respect to compliance with [the RFA], the adequacy of the rulemaking record with respect to small entities and the effect of the rule on small entities").

59.     The Office of Advocacy explained that Defendants' certification vis-à-vis the Proposed Rule was in error, because, *inter alia*:  (a) Defendants used an incorrect baseline for certification; (b) the rule will impose direct costs on small entities; and (c) the rule will have a significant economic impact on small businesses. Office of Advocacy Comments at 4. The Office of Advocacy advised Defendants to withdraw the Proposed Rule and conduct a SBAR panel. *Id*. at 9; *see* 126 Cong. Rec. H24589 (Sept. 9, 1980) ("Any significant comments from the public or especially the Office of Advocacy that a rulemaking should be accompanied by a regulatory flexibility analysis should be given the utmost serious consideration by an agency.").

60.     On November 11, 2014, AEMA submitted comments on the Proposed Rule. Comments from Laura Skaer, Executive Director, AEMA, to EPA (Nov. 10, 2014) ("AEMA Comments"). AEMA's comments incorporated the Office of Advocacy's comments by reference. AEMA Comments at 12.

61.     AEMA demonstrated that Defendants issued the Proposed Rule without complying with the RFA. AEMA Comments at 10–13. AEMA further showed that the Proposed Rule will have a significant economic impact on small entities. *Id*. at 11. Accordingly, AEMA requested Defendants to withdraw the Proposed Rule, prepare an initial regulatory flexibility analysis, and conduct a SBAR panel pursuant to the RFA. *Id*. at 14.

62.     AEMA also advised that the Proposed Rule broadens the scope of CWA jurisdiction past constitutional and statutory limits and will have problematic implications for AEMA members.  AEMA Comments at 2–9.

**B.     The Final Rule.**

63.     On June 29, 2015, the Defendants published the Final Rule defining "waters of the United States" in the *Federal Register*.  80 Fed. Reg. 37,054 (June 29, 2015).  The Final Rule is final agency action.

64.     The Final Rule contains changes from the Proposed Rule that were not available for public comment, such as, *inter alia*:  (a) defining "bed and banks;" (b) redefining "neighboring" to include a floodplain interval and specific boundaries; and (c) changing the category of "other waters."  80 Fed. Reg. at 37,079–80, 37,082–83, 37,086–87.

65.     The Final Rule defined "bed and banks" as "physical indicators [that] demonstrate there is volume, frequency, and duration of flow sufficient to create a bed and banks and an ordinary high water mark ...."  80 Fed. Reg. at 37,076, 37,105.  "Bed and banks" was not defined in the Proposed Rule.

66.     The Final Rule substantively changed the definition of "neighboring," which is used in the definition of "adjacent."  80 Fed. Reg. at 37,082, 37,105.  In doing so, Defendants removed any reference to "riparian area" and no longer defined "floodplain."  *Id*.

67.     Instead, the Final Rule defined "neighboring" as:  (a) "[a]ll waters located within 100 feet of the ordinary high water mark" of certain waters; (b) "[a]ll waters located within the 100-year floodplain" of certain waters "and not more than 1,500 feet from the ordinary high water mark of such water[;]" and (c) "[a]ll waters located within 1,500 feet of the high tide line

of" a certain water "and not more than 1,500 feet of the ordinary high water mark of the Great

Lakes."  80 Fed. Reg. at 37,082–83, 37,105.

68.     The Final Rule added a new category, not in the Proposed Rule, to "other waters"

that could be jurisdictional under a case-specific analysis.  80 Fed. Reg. at 37,082, 37,086–87,

37,105.  The new category of "other waters" amenable to case-specific analysis includes:

> All waters located within the 100-year floodplain of [traditional navigable waters,
> interstate waters, and the territorial seas] and all water located within 4,000 feet of
> the high tide line or ordinary high water mark of [traditional navigable waters,
> interstate waters, territorial seas, impoundments, and tributaries] where they are
> determined on a case-specific basis to have a significant nexus to [traditional
> navigable waters, interstate waters, and territorial seas].

*Id*. at 37,105.

69.     In the Final Rule, Defendants also added the definition of "high tide line" to the

EPA's regulations for the first time, though it was previously defined in the Corps' regulations.

80 Fed. Reg. at 37,073.  "High tide line" is defined as "the line of intersection of the land with

the water's surface at the maximum height reached by a rising tide."  80 Fed. Reg. at 37,106.

70.     The Final Rule contains a section titled "Economic Impacts," which appears to be

based on Defendants' updated economic analysis utilizing more recent data.  80 Fed. Reg. at

37,101; "Economic Analysis of the EPA-Army Clean Water Rule" (May 2015) ("Final

Economic Analysis").

71.     The Final Economic Analysis purportedly addresses problems with the Draft

Economic Analysis, such as the utilization of outdated field data.  Final Economic Analysis at vi.

However, the Final Economic Analysis also suffers from incompleteness, limitations, and errors.

*Id*. at v, 6.

72.     In the Final Economic Analysis, Defendants again compared the Final Rule to the

historic practices baseline and to the recent practices baseline.  Final Economic Analysis at iv–v,

5; 80 Fed. Reg. at 37,101.  This time, Defendants grounded the recent practices baseline on

2013–2014 field data, instead of 2009–2010 field data.  *Id*.; Final Economic Analysis at vi, 5.

73.     Using the 2013–2014 field data, the recent practices baseline showed the Final

Rule would cause an "estimated increase of between 2.84 and 4.65 percent in positive

jurisdictional determinations annually."  Final Economic Analysis at vii, ix, 12, 13, 53; 80 Fed.

Reg. at 37,102.  This increase in jurisdiction is estimated to annually cost regulated entities

$158M–$307M, or $237M–$465M.  *Id*. at 37,101; Final Economic Analysis at x, xi.  However,

it is likely that the Final Rule's increase in jurisdiction and the estimated costs are much higher.

74.     Defendants posit in the Final Rule's Economic Impacts section that "[t]he

potential costs and benefits incurred as a result of this rule are considered indirect ...."  80 Fed.

Reg. at 37,101.

75.     However, the estimated costs that will be incurred by regulated entities as a result

of this rule are direct.  In fact, the Final Rule will lead to more regulation under the CWA.

76.     In addition, the Final Economic Analysis does not contain an analysis of the

economic impact on small entities.  Instead, the Final Economic Analysis encompasses all

entities together.  80 Fed. Reg. 37,101; Final Economic Analysis at iv, 1, 14, 21.

77.     Despite this glaring deficiency, in the Final Rule, Defendants make the

unsupported certification that:  "After considering the economic impacts of this rule on small

entities, we certify that this final rule will not have a significant economic impact on a substantial

number of small entities."  80 Fed. Reg. at 37,102; *see* Final Economic Analysis at 60.

Consequently, Defendants sidestepped their obligation to complete a final regulatory flexibility

analysis under the RFA.  *See* 80 Fed. Reg. at 37,102; 5 U.S.C. §§ 604, 605(b).

78.     In addition, the Final Rule's certification is fundamentally flawed just like the

Proposed Rule's certification.  For example, the Final Rule's certification does not contain the

factual basis as required by the RFA, but simply states that:

> The scope of jurisdiction in this proposed rule is narrower than that under the
> existing regulations....  Because fewer waters will be subject to the CWA under
> the rule than are subject to regulation under the existing regulations, this action
> will not affect small entities to a greater degree than the existing regulations.  As a
> consequence, this action will not have a significant adverse economic impact on a
> substantial number of small entities, and therefore no regulatory flexibility
> analysis is required.

80 Fed. Reg. at 37,102.

79.     Defendants' statement that "[t]he scope of jurisdiction in this proposed rule is

narrower than that under the existing regulations," 80 Fed. Reg. at 37,102, is belied by

Defendants' analysis of the Final Rule's increase in jurisdiction and increase in costs to entities

under the recent practices baseline.

80.     Moreover, in making the certification, Defendants did not explain their reliance

on the historic practices baseline over the recent practices baseline, the latter of which provides a

more accurate picture of the economic impact on regulated entities—though neither demonstrate

the impact on small entities as separate from all regulated entities.

81.     The Final Rule's certification violates the RFA, because, *inter alia*:  (a) it uses the

wrong baseline to determine whether it will have a significant economic impact on a substantial

number of small entities; (b) it is unsupported by the Final Economic Analysis and the law; and

(c) it lacks a factual basis addressing the key components of the certification:  significant

economic impact, substantial number, and small entities.

## FIRST CLAIM FOR RELIEF
### (Violation of the RFA)

82.     AEMA incorporates the allegations in the preceding paragraphs as if fully set

forth herein.

83.     AEMA is a small entity and AEMA has members that are small entities and

members that have small mining business concerns.

84.     AEMA and AEMA's small entity members have suffered "legal wrong" and are

"adversely affected" and/or "aggrieved" by the Defendants' Final Rule defining "waters of the

United States."  5 U.S.C. § 611; *id*. § 702.

85.     The Final Rule containing the Defendants' certification is "final agency action for

which there is no other adequate remedy in court."  5 U.S.C. § 704.

86.     The Final Rule increases the Defendants' scope of jurisdiction under the CWA,

which in turn imposes increased costs on AEMA's small entity members conducting activities in

the vicinity of waters, which will likely be jurisdictional under the Final Rule.

87.     Defendants' certification that the Final Rule will not have a significant economic

impact on a substantial number of small entities is improper, fails to satisfy the requirements

under the RFA, and suffers from major defects.

88.     Defendants also made a certification in the Proposed Rule, which allowed them to

sidestep their obligations to convene a SBAR panel and complete an initial regulatory flexibility

analysis.  This certification was also improper, failed to satisfy the requirements under the RFA,

and suffered from major defects.

89.     In making the certification in the Final Rule, Defendants improperly relied on the

definitional nature of the Final Rule and its alleged clarification of jurisdiction, when the Final

Rule actually increases jurisdiction and makes substantive changes to the definition of "waters of the United States."

90.     In making the certification, Defendants improperly used the historic practices baseline, rather than the recent practices baseline.

91.     Defendants provide no explanation for choosing the historic practices baseline over the recent practices baseline, which provides the closest approximation of the Final Rule's economic impact.

92.     Defendants' certification is not only improper, but also lacks the required factual basis under the RFA.  Nowhere do Defendants make findings regarding the economic impact on small entities.  Instead, Defendants assume small entities will not be significantly impacted by the Final Rule when compared to the historic practices baseline.

93.     Defendants wrongly posit that the economic impact of the Final Rule on regulated entities is indirect, instead of direct.

94.     Defendants' Final Economic Analysis also suffers from a lack of reliable data and analysis, and underestimates the increase in jurisdiction and increase in costs of the Final Rule.

95.     Additionally, Defendants never examined the economic impact on small entities in the Final Economic Analysis; rather, Defendants purported to examine the economic impacts on *all* entities.

96.     Defendants' certification is:  (a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (b) contrary to constitutional right, power, privilege, or immunity; (c) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and/or (d) without observance of procedure required by law.  5 U.S.C. § 706(2).

97.     Because Defendants' certification was improper and the Final Rule will have a significant economic impact on a substantial number of small entities, Defendants were required to prepare a final regulatory flexibility analysis.  *See* 5 U.S.C. § 604.  As Defendants failed to prepare a final regulatory flexibility analysis, they violated the RFA, which renders the Final Rule:  (a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (b) contrary to constitutional right, power, privilege, or immunity; (c) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and/or (d) without observance of procedure required by law.  5 U.S.C. § 706(2).

98.     Therefore, the Final Rule must be "h[eld] unlawful and set aside …."  5 U.S.C. § 706(2).

## SECOND CLAIM FOR RELIEF
### (Violation of the APA)

99.     AEMA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

100.    AEMA and AEMA's members have suffered "legal wrong" and are "adversely affected" and/or "aggrieved" by the Defendants' Final Rule defining "waters of the United States."  5 U.S.C. § 702.

101.    The Final Rule containing the Defendants' certification is "final agency action for which there is no other adequate remedy in court."  5 U.S.C. § 704.

102.    Under the APA, Defendants must provide an opportunity for public comment on changes made to a proposed rulemaking in the Final Rule that are not a "logical outgrowth."  5 U.S.C. § 553(b), (c).

103.    In the Final Rule, Defendants defined the previously undefined phrase "bed and banks" in the definition of "tributary."  80 Fed. Reg. at 37,058, 37,079.  Defendants did not

provide an opportunity for public comment on this new definition and this new definition was not a logical outgrowth from the definition of "tributary" provided in the Proposed Rule.

104.     In the Final Rule, Defendants substantively changed the definition of "neighboring" by removing the definitions for "riparian area" and "floodplain."  80 Fed. Reg. at 37,083.  Defendants newly defined "neighboring" in the Final Rule as:  (a) all waters located within 100 feet of the ordinary high water mark of certain waters; (b) all waters located within the 100 year floodplain of certain waters, but not more than 1,500 feet from the ordinary high water mark of that water; and (c) all waters located within 1,500 feet of the high tide line of certain waters, and within 1,500 feet of ordinary high water mark of the Great Lakes.  *Id.* 37,082–83.  Defendants did not provide an opportunity for public comment on this new definition and this new definition was not a logical outgrowth from the definition of "neighboring" provided in the Proposed Rule.

105.     In the Final Rule, Defendants also added a new category of waters that could be jurisdictional under a case-specific analysis:  (a) all water located within the 100 year floodplain of traditional navigable waters, interstate waters, or the territorial seas; and (b) all waters located within 4,000 feet of the high tide line or ordinary high water mark of traditional navigable waters, interstate waters, territorial seas, impoundments, or tributaries.  80 Fed. Reg. at 37,087–88.  Defendants did not provide an opportunity for public comment on this new category and this new category was not a logical outgrowth from the Proposed Rule.

106.     In the Final Rule, Defendants also added the definition of "high tide line" to the EPA's regulations for the first time, though it was previously defined in the Corps' regulations. 80 Fed. Reg. at 37,073.  Defendants did not provide an opportunity for public comment on this

new addition to the EPA's regulations and this new addition was not a logical outgrowth from the Proposed Rule.

107.     The foregoing material changes from the Proposed Rule to the Final Rule, *inter alia*, demonstrate that the Final Rule was promulgated in violation of the notice and comment requirements of the APA, 5 U.S.C. §§ 553(b), (c).

108.     Accordingly, the Final Rule is:  (a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (b) contrary to constitutional right, power, privilege, or immunity; (c) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and/or (d) without observance of procedure required by law.  5 U.S.C. § 706(2).

109.     Therefore, the Final Rule must be "h[eld] unlawful and set aside …."  5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

**WHEREFORE**, AEMA, respectfully requests that this Court:

1.     Declare that Defendants' certification was:  (a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (b) contrary to constitutional right, power, privilege, or immunity; (c) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and/or (d) without observance of procedure required by law;

2.     Declare Defendants violated the RFA by improperly certifying the Final Rule would not "have a significant economic impact on a substantial number of small entities";

3.     Declare that Defendants violated the RFA by failing to prepare a final regulatory flexibility analysis;

4.     Declare that Defendants' violation of the RFA renders the Final Rule:  (a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (b)

contrary to constitutional right, power, privilege, or immunity; (c) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and/or (d) without observance of procedure required by law;

5.    Declare that Defendants' definition of "bed and banks" used in the definition of "tributary" in the Final Rule was not a logical outgrowth from the definition of "tributary" in the Proposed Rule;

6.    Declare Defendants' definition of "neighboring" in the Final Rule was not a logical outgrowth from the definition of "neighboring" in the Proposed Rule;

7.    Declare Defendants' new category of waters that could be jurisdictional under a case-specific analysis in the Final Rule was not a logical outgrowth from the Proposed Rule;

8.    Declare Defendants' addition of the definition of "high tide line" to the EPA's regulations was not a logical outgrowth from the Proposed Rule;

9.    Declare the Defendants violated the APA by not providing the public with the opportunity to comment on the material changes they made from the Proposed Rule to the Final Rule;

10.    Declare that the Final Rule is:  (a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (b) contrary to constitutional right, power, privilege, or immunity; (c) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and/or (d) without observance of procedure required by law;

11.    Hold unlawful and set aside the Final Rule in light of Defendants' violations of the RFA and the APA;

12.    Award AEMA costs and attorneys' fees in accordance with law, including the Equal Access to Justice Act, 28 U.S.C. § 2412; and

13.     Award AEMA such further relief as this Court deems just and equitable.

DATED this 23rd day of June 2016.

Respectfully Submitted,

MOUNTAIN STATES LEGAL FOUNDATION

/s/ Steven J. Lechner
Steven J. Lechner, D.C. Bar No. AZ 0001
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)
lechner@mountainstateslegal.com

Attorney for American Exploration & Mining Association